## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOSEPH GLENN, IV** | **CIVIL ACTION** |
| **versus** | **NO. 13-6595** |
| **BURL CAIN, WARDEN** | **SECTION: "G"(3)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that the matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Joseph Glenn, IV, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On March 20, 2003, he was convicted of second degree murder under Louisiana law.[1]  On April 10, 2003, he was sentenced to  a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On March 1, 2005, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction but remanded the matter for resentencing.[3]  On

---

[1] State Rec., Vol. V of X, transcript of March 20, 2003, p. 79; State Rec., Vol. I of X, minute entry dated March 20, 2003; State Rec., Vol. I of X, jury verdict form.

[2] State Rec., Vol. V of X, transcript of April 10, 2003, p. 9; State Rec., Vol. I of X, minute entry dated April 10, 2003.

[3] State v. Glenn, 900 So.2d 26 (La. App. 5th Cir. 2005) (No. 04-KA-526); State Rec., Vol. VI of X.

November 14, 2006, the state district court resentenced petitioner to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[4]  Petitioner did not appeal that resentencing.

On November 14, 2008, petitioner, through counsel, filed a post-conviction application with the state district court.[5]  That application was denied on January 5, 2009.[6]

Petitioner, through counsel, then filed a motion to correct illegal sentence with the state district court on November 7, 2011,[7] as well as an amended motion on November 18, 2011.[8]  Those motions were denied on December 12, 2011,[9] and February 8, 2012.[10]  He then filed a motion for reconsideration on March 9, 2012,[11] which was likewise denied on April 18, 2012.[12]  Counsel thereafter filed a notice of appeal.[13]  On May 13, 2013, the Louisiana Fifth Circuit Court of Appeal dismissed the appeal because, pursuant to La. Code Crim. P. art. 930.6(A), there is no appeal from a denial of post-conviction relief; rather, a petitioner may seek review of such a denial only by filing

---

[4] State Rec., Vol. VI of X, transcript of November 14, 2006; State Rec., Vol. VI of X, minute entry dated November 14, 2006.

[5] State Rec., Vol. VI of X.

[6] State Rec., Vol. VI of X, Order dated January 5, 2009.

[7] State Rec., Vol. VI of X.

[8] State Rec., Vol. VI of X.

[9] State Rec., Vol. VI of X, Order dated December 12, 2011.

[10] State Rec., Vol. VI of X, Order dated February 8, 2012.

[11] State Rec., Vol. VI of X.

[12] State Rec., Vol. VI of X, Order dated April 18, 2012.

[13] State Rec. Vol. VI of X.

a writ application for supervisory review.[14]  When counsel subsequently filed such writ application,

it was denied by the Louisiana Fifth Circuit Court of Appeal on June 20, 2013.[15]

On December 5, 2013, petitioner, through counsel, filed the instant federal

application for *habeas corpus* relief.[16]  In support of his application, he asserts the following claims:

1.    The trial court erred in dismissing his post-conviction claims

on procedural grounds; and

2.    Recent medical advances "cast serious doubt on several

critical elements of the State's case."[17]

### I.  Exhaustion

The state argues that petitioner's federal application is subject to dismissal because

he failed to exhaust his remedies in the state courts.  For the following reasons, it is clear that the

state is correct.

Pursuant to 28 U.S.C. § 2254(b)(1)(A), a petitioner normally must first exhaust his

remedies in the state courts before seeking *habeas corpus* relief from the federal courts.  "To

exhaust, a petitioner must have fairly presented the substance of his claim to the state courts."

Wilder v. Cockrell, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotation marks omitted).  Generally,

the exhaustion requirement is satisfied only when the grounds urged in a federal petition were

---

[14]  State v. Glenn, No. 12-KA-856 (La. App. 5th Cir. May 1, 2013); State Rec., Vol. X of X.

[15]  State v. Glenn, No. 13-KH-454 (La. App. 5th Cir. June 20, 2013); State Rec., Vol. X of X.

[16]  Rec. Doc. 1.

[17]  Rec. Doc. 1, p. 7.

previously presented to the state's *highest court* in a procedurally proper manner according to state court rules.  <u>Dupuy v. Butler</u>, 837 F.2d 699, 702 (5th Cir. 1988).

Here, petitioner did not seek direct review of his conviction or sentence by the Louisiana Supreme Court, and he has filed no writ applications with that court seeking review of the denials of post-conviction relief.  Because he has never presented the instant claims to Louisiana's highest court, his federal application is subject to dismissal without prejudice based on the lack of exhaustion.

That said, it would not be in the interests of justice and judicial economy to dismiss petitioner's federal application without prejudice on that basis because, as the state alternatively argues, his application is untimely and presents no cognizable federal claim.  Therefore, the application should instead be dismissed **with prejudice** on those bases for the following reasons.

## II.  Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  28 U.S.C. § 2244(d)(1)(A).[18]  For the purposes of

---

[18]  Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, the state argues that Subsection A is applicable, and petitioner does not contend otherwise.  The Court finds that the state is correct, in that the other subsections simply do not apply.  Subsection B delays the commencement of the federal limitations period if a petitioner was "prevented" from filing a timely petition due to a state action which violated the Constitution or laws of the United States; here, no such state action is alleged. Subsection C delays commencement if a petitioner's claim is based on a constitutional right which has been newly recognized by the United States Supreme Court and made retroactively applicable to cases on collateral review; however, petitioner asserts no such claim.  The only other even arguably applicable subsection would be Subsection D, which delays the commencement if a petitioner's claim is based on a factual predicate which could not have been discovered earlier through the exercise of due diligence.  Here, petitioner refers to "newly discovered evidence," i.e. new medical research which he opines casts doubt on his guilt.  Even he were to argue that the "new

the AEDPA, a state criminal judgment is not final until *both* the petitioner's conviction *and* sentence are final.  See Burton v. Stewart, 549 U.S. 147, 156-57 (2007); Scott v. Hubert, 635 F.3d 659, 665-67 (5th Cir. 2011).  As noted, the state district court resentenced petitioner on November 14, 2006.  Therefore, his state criminal judgment became final for AEDPA purposes no later than December 14, 2006, when his time expired for filing an appeal with respect to that resentencing.[19]  See, e.g., Tabor v. Terrell, Civ. Action No. 11-1116, 2011 WL 5325544, at *1 (E.D. La. Oct. 3, 2011), adopted, 2011 WL 5325540 (E.D. La. Nov. 3, 2011).  Accordingly, his federal limitations period commenced on that date and expired one year later on December 14, 2007, unless that deadline was extended through tolling.

---

evidence" constitutes a "factual predicate" within the meaning of Subsection D, that "new evidence" does not serve as the basis of a cognizable *habeas* claim.  In his federal application, he claims that the state courts wrongly denied post-conviction relief on procedural grounds and, arguably, that he is actually innocent; however, for reasons explained in detail later in this opinion, neither of those claims is cognizable in a *habeas* proceeding.  Because the "new evidence" does not serve as a basis for a cognizable *habeas* claim, it does not trigger Subsection D.  See, e.g., Tate v. Parker, No. 4:06CV99, 2010 WL 2606045, at *2-3 (S.D. Miss. June 22, 2010), aff'd, 439 Fed. App'x 375 (5th Cir. 2011); see also Ware v. Secretary, Department of Corrections, No. 8:11-cv-418, 2011 WL 5525359, at *6 (M.D. Fla. Nov. 14, 2011) ("Since a free-standing claim of actual innocence is not a cognizable claim, [a prisoner] is not entitled to employ such a claim to reset his time clock under § 2244(d)(1)(D)."); Morales v. McNeil, No. 09-21335-CIV, 2010 WL 2976552, at *4 (S.D. Fla. June 14, 2010) ("[T]o the extent that any or all of the affidavit testimony is being offered in support of the petitioner's claim that he is entitled to habeas relief on the basis of newly discovered evidence of his innocence, the petitioner would not be entitled to tolling under § 2244(d)(1)(D), because this evidence suggesting his innocence is actually the claim itself, rather than the factual predicate of an independent claim.  Because claims of actual innocence based on newly discovered evidence do not state a ground for federal habeas relief absent an independent constitutional violation, the petitioner would not be entitled to tolling under § 2244(d)(1)(D)."), adopted, 2010 WL 2976550 (S.D. Fla. July 20, 2010); Green v. Stevenson, No. 6:08-4152, 2009 WL 3562297, at *6 (D.S.C. Oct. 30, 2009) (same); Hammack v. Quarterman, No. 4:06-CV-111, 2006 WL 1831329, at *3 (N.D. Tex. June 30, 2006) (same); Pruett v. Cockrell, No. 4-99-CV-781, 2001 WL 1516735, at *9 (N.D. Tex. Nov. 21, 2001) (same).

[19]  Under Louisiana law, petitioner had thirty days in which to appeal.  La. Code Crim. P. art. 914.

The Court first considers statutory tolling.  The AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).  However, petitioner had no state applications pending during the applicable one-year period; therefore, he clearly is not entitled to statutory tolling.[20]

The Court must next consider equitable tolling.  The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling.  Holland v. Florida, 560 U.S. 631, 645 (2010).  However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  Id. at 649 (internal quotation marks omitted); see also Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").  Petitioner bears the burden of proof to establish entitlement to equitable tolling.  Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).  In the instant case, he has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

---

[20]   The Court notes that petitioner filed various state applications long after that date.  However, because all of those applications were filed after the expiration of the federal statute of limitations, they had no bearing on the timeliness of his federal application.  See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4, aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000).  Simply put, once the federal limitations period expired, "[t]here was nothing to toll."  Butler v. Cain, 533 F.3d 314, 318 (5th Cir. 2008).

The Court also notes that the United States Supreme Court recently held:  "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013).  Here, petitioner's counsel does not argue that the instant case falls within the parameters of McQuiggin.  However, because he references "newly discovered evidence" which he opines casts doubts on his guilt, the Court will consider McQuiggin's applicability.

Although the United States Supreme Court held for the first time in McQuiggin that a federal *habeas* petitioner can "overcome" the AEDPA's statute of limitations by showing that he is actually innocent of the crime of which he stands convicted,[21] the Supreme Court took care to note:  "We caution, however, that tenable actual-innocence gateway pleas are rare:  '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, *no juror*, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  McQuiggin, 133 S. Ct. at 1928 (emphasis added) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).  The United States Sixth Circuit Court of Appeals recently explained:  "To assess that question, a court must survey 'all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial.'"  Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013) (quoting House v. Bell, 547 U.S. 518, 538 (2006)).

---

[21]  McQuiggin clearly changed the law in this Circuit.  Prior to McQuiggin, the United States Fifth Circuit Court of Appeals had expressly held that a petitioner's claims of actual innocence were irrelevant when assessing the timeliness of an application under the AEDPA.  Cousin v. Lensing, 310 F.3d 843, 849 (5th Cir. 2002).

A logical starting point, therefore, is for this Court to look to the "old" evidence in this case, i.e. the evidence presented at trial and on which petitioner's conviction is based. That evidence is recounted in the Louisiana Fifth Circuit Court of Appeal's summary of the facts of this case on direct appeal:

> Victoria Glenn, daughter of Joseph Glenn, IV and Nicole Vinet, was born on September 21, 2001. Nicole Vinet testified that Victoria was healthy at birth and, except for a little reflux, she was fine at both her two-week and one-month check-ups. Two-month-old Victoria died at 5:01 a.m. on November 26, 2001, with her death classified as a homicide secondary to child abuse.
>
> On November 24, 2001, Glenn kept Victoria while the child's mother went to work. Although Glenn was living with Vinet at the time, Glenn was going to watch Victoria at his mother's house, because he had custody of his three-year-old son, Kevin, that weekend. Vinet testified that she did not realize that Glenn was also going to have custody of his five-month-old daughter, Veronica, a daughter about which she was unaware. On that day, at approximately 9:00 a.m., Vinet met Glenn at the Aspen Clinic to exchange custody of Victoria. Vinet testified that Glenn was a good father and she trusted him with her child.
>
> Glenn stated that the child was normal when he received custody of her from her mother. He then contends that he placed her in the video room to watch television in her car seat next to the sofa. Glenn testified that, because Victoria was spitting up, he set the car seat erect. According to Glenn, he and Kevin were watching a cartoon and teasing each other when he reached for a toy and lost his balance while wearing socks. Glenn alleges that his foot hit the carrier from the back side and, simultaneously, Kevin ran into the carrier and knocked the infant seat over. Glenn further testified that he knocked the car seat off of Victoria and picked her up. Glenn noticed she was not breathing, performed CPR, and called 911 twice. Glenn testified that after the fall, he reacted and shook Victoria to revive her when she failed to cry or make a sound.
>
> At approximately 12:44 p.m. on November 24, 2001, paramedics Phil Alimia and Andy Vaccaro responded to the 911 call and arrived at 1318 Lake Frances Drive in Harvey at 12:57. Lieutenant Gary Hargroder responded to the 911 call and arrived shortly thereafter. Glenn opened the door for the paramedics after a minute or so with the baby in his arms and placed her on the sofa. Victoria was not breathing and was blue; as a result, she was brought

to the ambulance and the paramedics started to breathe for her, bagged her, and put a tube down her trachea.  Initially, Victoria responded and "pinked up" and her pulse was found; however, her condition worsened.  Lieutenant Hargroder assisted with chest compressions and rode in the back of the ambulance to Meadowcrest Hospital.

Phil Alimia testified of the importance to know the history of a patient in order to treat that patient.  Glenn told him that he gave Victoria Tylenol to calm her down because she was cutting up.  He never mentioned that she fell and hit her head or that he shook her, information that Phil Alimia would have wanted to know.  Phil Alimia did not note any external injuries to the victim's head.  Lieutenant Hargroder testified that he was given the same history from Glenn.

Raymond Gorman, a deputy with the Jefferson Parish Sheriff's Office, testified as to the history he was given at the hospital: Glenn had given Victoria Mylicon drops and then a few hours later, fed the baby and gave her Tylenol because she was whining.  Because she turned blue shortly thereafter, Glenn called 911.  Glenn never mentioned she fell and hit her head or that he shook her.  However, Glenn denies speaking to any officers at Meadowcrest Hospital.

Emergency Room physician Dr. An Nguyen treated Victoria at Meadowcrest Hospital when she arrived in cardio pulmonary arrest.  She was not breathing and did not have vital signs.  Although she was in critical condition, Dr. Nguyen was able to resuscitate her, re-intubate her and give her life support medications.  Dr. Nguyen then ran basic blood work on Victoria and conducted a chest X-ray.  She was not able to determine what caused the cardiac arrest and did not notice any external trauma to Victoria's head.  Dr. Nguyen called Victoria's pediatrician to examine her.  At this time, Victoria was stabilized and, although she was not breathing on her own, she had a heartbeat and vital signs.

Dr. Mark Allen Fisher, Victoria's pediatrician, testified that he saw Victoria for the first time after her birth on September 21, 2001, and then again while in the nursery.  He later examined her at her two-week visit and then again for a one-month check-up.  For all of these visits, Dr. Fisher testified that Victoria's eyes were normal and that she was in good condition.  The next time Dr. Fisher examined Victoria was on November 24 at Meadowcrest Hospital after Dr. Nguyen called him.  At this time, Victoria's eyes appeared abnormal and suspicious of retinal hemorrhages.  Although other things were considered, these findings made him suspicious of possible abuse.

According to Dr. Fisher, a patient's history is probably the most important thing leading to a correct diagnosis. Dr. Fisher only knew that Victoria was fed, placed in her infant seat, and then fifteen minutes later an older sibling notified defendant that she was having difficulty breathing. At no time was he aware of Victoria falling out of the car seat and hitting her head on tile or that defendant shook the baby; however, he testified that knowing this history would have been helpful to him in his examination of Victoria. Dr. Nguyen testified that it is important to give the ER physician an accurate history. Glenn told Dr. Nguyen the child was cranky and so he gave her some Tylenol. When she turned blue and was not breathing, he called 911. At no time did Glenn mention to her the child fell and hit her head or that he shook her.

Once stabilized at Meadowcrest Hospital, Victoria was transferred to Children's Hospital. At Children's Hospital on November 25 at 8:00 a.m., Victoria was examined by Dr. George Ellis, Director of Ophthalmology at Children's Hospital. Dr. Ellis was accepted as an expert and testified as to his findings. According to Dr. Ellis, Victoria did not have a previous eye history or any known bleeding disorder. A cat scan of Victoria's head showed cerebral edema and bleeding in several different layers of the brain, including subarachnoid, subdural and interventricular hemorrhage. A healing rib fracture was also noted. With this background information, Dr. Ellis conducted an eye examination and noticed her pupils were dilated and fixed, which can be caused by cerebral edema. Victoria's eyelids were normal with no sign of bruising or hemorrhage. No hemorrhage was noted with the conjunctiva. Massive bleeding was found, however, in front of the retina. There was also extensive swelling and hemorrhage in the macula. Blood was also found in the vitreous. Dr. Ellis testified that hemorrhage was evident in both eyes. Dr. Ellis further testified that multi-layer bleeding in the eye's posterior indicates very severe head trauma and explained "shaken baby syndrome," and Victoria was diagnosed with shaken baby syndrome retinopathy.

Dr. Kenneth James Ward, Head of Department of Radiology at Children's Hospital, was accepted as an expert and testified as to his findings. He reviewed CT scans and X-rays on Victoria and consulted with Dr. Benton. Dr. Ward testified that subdural hematomas do not occur when children fall from a height six feet or less, including a fall from a sofa onto a rigid floor. Dr. Ward noted blood in ventricles and was immediately concerned that this was a high velocity injury. Dr. Ward also found blood in the subdural and the subarachnoid spaces, and noted cerebral edema. Such injuries are consistent with high velocity trauma. After Dr. Ward saw no signs

of external trauma and with the absence of appropriate history, he considered this child abuse. Dr. Scott Benton was notified of this. A skeletal survey of Victoria revealed she had healing posterior rib fractures, that is, she had been traumatized in the past, at least probably seven to ten days to two to four weeks before the injuries to her head occurred. In Dr. Ward's opinion, these fractures resulted from squeezing rather than resuscitation. Dr. Ward agreed that Victoria's injuries resulted from shaken baby syndrome.

Dr. Scott Benton, accepted as an expert in the field of forensic pediatric medicine, examined Victoria in the intensive care unit at Children's Hospital on November 25 and testified as to his findings. Dr. Benton's findings of multiple layers of hemorrhage were related to acceleration, deceleration injuries. The head has to move back and forth violently, as expected with shaking. Victoria had bilateral subdural hemorrhage, bilateral optic nerve sheath hemorrhage, retinal hemorrhage, and her fourth and fifth ribs were fractured. These rib fractures were estimated to be two weeks old by radiograph. Posterior rib fractures are not consistent with CPR, but are almost exclusive to child abuse, a grabbing around the chest. There was no evidence of impact trauma to the head or mid-face area. Dr. Benton testified that there was no doubt in his mind that Victoria was the victim of battered child syndrome.

Dr. Benton also testified as to the importance of an accurate history of a patient for treatment and diagnosis. At the hospital, Glenn told him that his son pointed out to him that Victoria was not breathing and then described his resuscitative efforts. The history given by Glenn to Dr. Benton was not consistent with his findings. Glenn never mentioned anything about Victoria falling from a car seat or that he shook the baby. However, Glenn denied speaking to Dr. Benton. Dr. Benton's diagnosis was inflected cerebral trauma, known as "'shaken baby syndrome.'" This, grouped with the older rib fractures, was defined as battered child syndrome.

Detective Donald Meunier of the Jefferson Parish Sheriff's Office Homicide Division received a call from Dr. Benton in reference to a child he examined in critical condition not expected to survive her injuries. Dr. Benton believed an investigation was necessary. Detective Meunier spoke to Glenn briefly at Children's Hospital, and Glenn agreed to accompany him and David Mascaro to the Criminal Investigation Bureau. Glenn was escorted to the interview room, filled out a Rights Form and was advised of his rights pursuant to an investigation for cruelty to a juvenile. Throughout this interview, Glenn gave five taped statements, all of which were admitted as evidence and played for the jury.

- 11 -

The first taped statement was at 11:54 p.m.  At no time in this statement did Glenn mention the fall and how he shook the child.  His first statement alleged that he fed Victoria, burped her and then placed her in her car seat next to the sofa.  Kevin was watching television and defendant was in the kitchen.  Kevin later alerted him to Victoria's condition.  When Glenn checked on Victoria, she was pale, starting to turn colors and was cold to touch.  Glenn described his resuscitation efforts and stated that he called 911.

In the second statement given at 1:29 a.m. on November 25, Glenn stated that while he was in the kitchen, Kevin accidentally knocked Victoria out of her car seat which was on the floor next to the sofa.  Glenn snatched her up from the ceramic tile, and she was not breathing so he started CPR.

Later at 2:06 a.m., a third statement was given in which Glenn admitted he and his son were playing and that he was sitting on the sofa teasing his son.  He bumped the carriage with the back of his right heel, and then his son knocked her over onto the ceramic tile.  Victoria was not strapped into her car seat.  He picked her up and began CPR.  He claimed he did not shake her at all.

A fourth statement was taped at 3:17 a.m. and added that the Glenn did shake the child after the fall to revive her.  He admits he did not tell the doctor what happened out of fear of losing his children and going to jail.

A fifth and final statement was given at 5:35 a.m. which included Glenn's description of the shaking.  He admits he was frustrated with Kevin and was shaking the child to wake her, but does not remember how many times he shook her when trying to treat her.  Glenn admitted lying to physicians because he was scared for everybody to find out the truth.  Detective Meunier described the shaking demonstrated by Glenn during the interview as an aggressive back and forth, vigorous and repeated shaking.

After the fifth statement, Glenn was booked with cruelty to a juvenile; however, he would be re-booked for second degree murder after Detective Meunier received information from Children's Hospital regarding the death of Victoria and talked to Dr. Traylor, the forensic pathologist that conducted the autopsy, and discovered her death was classified as a child abuse homicide.

Dr. James Glenn Traylor, Jr., accepted as an expert in the field of forensic pathology, performed an autopsy on two-month old Victoria on November 26, 2001, and testified regarding his findings.  Dr. Traylor testified that he found three external contusions: one just to the inside of the left nipple, another below the collar bone, and another on the bottom of the jaw line.  Such bruising is more consistent with grasping than with CPR; however, he could not

- 12 -

exclude the possibility that the bruise on the shoulder could have resulted from a fall. There was no other bruising evident to the head area or scalp. He found petechial hemorrhage, pin point areas of hemorrhage over the heart's surface and on the subdural surface of the anterior lungs (disseminated intervascular coagulation). He noticed swelling of the brain and both subdural and subarachnoid hemorrhage. Retinal hemorrhages were likewise noted. Dr. Traylor also found healing rib fractures, seven to fourteen days old. A diffuse axonal injury was present.

Dr. Traylor further testified that this type of trauma is abusive head injury, previously referred to as shaken baby syndrome. This type of injury results from a violent shaking of a baby back and forth causing acceleration and deceleration injuries, tearing wire-like connections called axions and veins that run along the midline with blood running into the subarachnoid and subdural spaces. Victoria's diffuse axonal injury, subarachnoid hemorrhage, subdural hemorrhage, and retinal hemorrhages are markers of shaken baby syndrome.[22]

The "newly discovered evidence" which petitioner now offers is a letter to his attorney from Dr. Peter J. Stephens, a forensic pathologist from North Carolina. In that letter, Dr. Stephens states:

At your request, I have reviewed the following materials in reference to Joseph Glenn, IV:

Trial transcript pages 5 through 185, dated Tuesday March 18 2003
Trial transcript pages 2 through 224, dated Wednesday March 19, 2003

Based on my review of these transcripts, my opinions are as follows:

1) I see no evidence that any serious attempt was made to consider alternative explanations of this child's problems. Various specialities in the medical community are well aware that there are numerous medical condition [sic] that may mimic abusive head injury but appear to have jumped to a conclusion without due consideration of these. Specifically, it is now well understood that short distance falls

---

[22] State v. Glenn, 900 So.2d 26, 29-33 (La. App. 5th Cir. 2005) (No. 04-KA-526); State Rec., Vol. VI of X.

may cause serious and/or lethal head injuries but the medical witnesses consistently rejected them as impossible. In the last decade numerous articles have appeared in the medical literature (both in the English speaking countries and in the foreign literature) publishing evidence and opinions contrary to those presented by the prosecution's witnesses.

2) Testimony by George Ellis, MD contains gross oversimplifications. While it is understood that retinal hemorrhages are commonly seen in inflicted head injury in infants and children, they also occur from other causes, as is becoming apparent from recent research by Patrick Lantz, MD. One of the other causes of retinal hemorrhage is increased intracranial pressure, especially when the increased intracranial pressure occurs rapidly. Dr. Ellis was aware of the massive brain swelling present in the deceased. On Page 107, Dr. Ellis apparently believes that there is a correlation between eye findings and the number of shakes administered to a child. There is no validation for this statement in the medical literature. Finally, Dr. Ellis is incorrect in his opinion stated at Page 108. Hazards from car seats are documented in the medical literature.

3) Testimony by Kenneth Ward, MD contains a statement that is erroneous and seriously misleading. At Page 168, he states that subdural hematoma does not occur in falls of less than 6 feet. It is well documented in the medical literature that skull fractures, with or without subdural hemorrhage may occur in falls of as little as two to three feet and modern medical opinion decries arbitrary comparisons with high velocity impacts sustained from high level falls or motor vehicle accidents. Dr. Ward is not a pathologist and his testimony on the same page indicates that he has little understanding of the neuropathological issues involved in pediatric head injury. Subsequent to the trial, a landmark paper from Stanford University by Drs. Patrick Barnes and Michael Krasnokutzky reviewed the radiological issues involved in pediatric head injury, including the many mimics of intentionally inflicted injury.

4) The testimony of James Traylor, MD, pathologist, contains additional errors of fact and ignores recent advances in the science of pediatric head injury. His testimony as to both "other primates" and as to retraction balls is irrelevant to the differential diagnosis of pediatric head injury. While he is a pathologist, he is not a board certified neuropathologist and there are neuropathological issues involved in this case. His testimony on Pages 40 through 42 gives an incomplete discussion of these issues. At Page 42 Line 32, he further

- 14 -

> makes the same mistake that Dr. Ward makes, and avers that injury will not occur "unless you're talking about 10 feet higher" (sic).  On Page 44, he discusses "Diffuse Axonal Injury", without reference to a series of papers published by Jennian Geddes, MD which demonstrated the immense complexity involved in diagnosing axonal injury and the fact that most of it results from hypoxia and ischemia secondary to brain swelling.   These inaccuracies alone raise significant doubt as to his testimony, but I reserve the right to make additional comments once I have seen all photographs and microscopic slides made during the course of this autopsy.[23]

Even if the Court assumes for the purposes of this decision that there is any evidentiary value in Dr. Stephens' unsworn assertions, those assertions fall far short of what is required to make a colorable showing of "actual innocence" under McQuiggin.  Stephens does not state that post-trial medical research proves that petitioner is innocent; rather, he simply indicates that such research offers other explanations as to how the victim's injuries could possibly have occurred.  However, a petitioner does not make a colorable "actual innocence" claim simply by showing that, in light of his new evidence, his guilt is questionable or that "reasonable doubt is conceivable." Costagno v. Grady, Civ. Action No. 12-3333, 547 U.S. 518, at *9 (E.D. Pa. July 23, 2013); Bastien v. Dragovitch, 128 F. Supp. 2d 204, 211 (M.D. Pa. 2000).  Rather, as previously noted, a petitioner must show that, in light of the new evidence, *no juror*, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 133 S. Ct. at 1928 (emphasis added) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).  Clearly, petitioner has not made that showing here, where abundant evidence indicative of guilt still exists.

Because petitioner is not entitled to statutory tolling, and because he has not established that he is eligible for equitable tolling or that the McQuiggin "actual innocence"

---

[23]  State Rec., Vol. VI of X, letter from Dr. Peter J. Stephens to Arthur L. Harris dated November 13, 2008.

exception applies, his federal application for *habeas corpus* relief had to be filed on or before December 14, 2007, in order to be timely.  Because his federal application was not filed until December 5, 2013, it is clearly untimely.

### III.  Lack of a Cognizable Claim

Lastly, out of an abundance of caution, the undersigned notes that even if petitioner's federal application had been timely filed, *which it was not*, he still would not be entitled to relief because neither of his claims are cognizable in a federal *habeas* proceeding.

Petitioner's first claim is that "[t]he trial court erred in dismissing petitioner's application on procedural grounds by concluding that it does not state a claim cognizable on application for post-conviction relief."[24]  However, *even if* the state courts erred in that regard, federal *habeas corpus* relief simply cannot be granted to remedy errors which occurred in state *post-conviction* proceedings.  As the United States Fifth Circuit Court of Appeals has explained:

> [O]ur circuit precedent makes abundantly clear that errors in state postconviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief.  See, e.g., Hallmark v. Johnson, 118 F.3d 1073, 1080 (5th Cir. 1997) ("[I]nfirmities in state habeas proceedings do not constitute grounds for relief in federal court."); Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself.") (internal quotations omitted).  Rather, we must find constitutional error at the trial or direct review level in order to issue the writ.

Morris v. Cain, 186 F.3d 581, 585 n.6 (5th Cir. 1999); see also Duff-Smith v. Collins, 973 F.2d 1175, 1182 (5th Cir. 1992); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *23

---

[24]  Rec. Doc. 1, p. 5.

(E.D. La. Oct. 29, 2009); <u>Baham v. Allen Correctional Center</u>, Civ. Action No. 07-4075, 2009 WL 3148757, at *3 (E.D. La. Sept. 30, 2009); <u>Davis v. Cain</u>, Civ. Action No. 07-6389, 2008 WL 5191912, at *6 (E.D. La. Dec. 11, 2008).

Petitioner's second and final claim is that "[r]ecent advances in pediatric medicine cast serious doubt on several of the critical elements of the State's case and that this newly discovered evidence warrants petitioner a new trial."[25]  The exact nature of this claim is unclear.  If petitioner is again simply arguing that the state courts erred in denying him post-conviction relief based on his "new evidence," then, as already noted, that claim is not cognizable because federal *habeas* relief cannot be granted to remedy alleged post-conviction errors.  On the other hand, if petitioner is instead claiming that his new evidence proves that he is actually innocent, and even if that claim had any merit whatsoever, which has not been shown, an "actual innocence" claim likewise offers no basis for granting *habeas* relief in any event.  As Justice Holmes noted long ago, what a federal *habeas* court has "to deal with is *not* the petitioner['s] innocence or guilt but *solely* the question whether [his] constitutional rights have been preserved."  <u>Moore v. Dempsey</u>, 261 U.S. 86, 87-88 (1923) (emphasis added).  The Supreme Court reiterated that view seventy years later, noting:

> Claims of actual innocence based on newly discovered evidence have *never* been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. ... This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – *not* to correct errors of fact.

---

[25]  Rec. Doc. 1, p. 7.

Herrera v. Collins, 506 U.S. 390, 400 (1993) (emphasis added); see also Kincy v. Dretke, 92 Fed. App'x 87, 92 (5th Cir. 2004); Lucas v. Johnson, 132 F.3d 1069, 1074 (5th Cir. 1998); Newman v. Cain, Civ. Action No. 09-4445, 2010 WL 1817771, at *7-8 (E.D. La. Apr. 12, 2010), adopted, 2010 WL 1838064 (E.D. La. May 4, 2010); Bolton v. Cooper, Civ. Action No. 07-626, 2007 WL 2713259, at *4 (E.D. La. Sept. 14, 2007).[26]  Where a convicted inmate uncovers new evidence tending to prove his innocence, his recourse is to seek executive clemency, not federal *habeas corpus* relief.  Herrera, 506 U.S. at 417.

## **RECOMMENDATION**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Joseph Glenn, IV, be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

---

[26]  The undersigned takes care to note that McQuiggin did *not* change this rule.  As discussed previously in this opinion, McQuiggin held only that a federal petitioner may overcome the statute of limitations by making a colorable showing of "actual innocence."  The decision did not address whether "actual innocence" is cognizable as a freestanding *habeas* claim.  See McQuiggin, 133 S.Ct. at 1931.

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[27]

New Orleans, Louisiana, this twenty-eighth day of March, 2014.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[27] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.